Common Pleas Court of Hamilton County.

OLD BEN COAL CORP. v. UNIVERSAL COAL SALES CO., ET AL.

Decided July 16, 1931.

*Nichols, Morrill, Wood, Marx & Ginter,* for the plaintiff.
*William F. Fox,* for Universal Coal Co.
*Dempsey & Dempsey,* for Price Hill Collieries Co.

MATTHEWS, J.

This case comes before the court upon the motions of the defendants to set aside the verdict hereinbefore rendered in favor of the plaintiff and for a new trial.

The allegations of the petition set forth that each of the defendants were corporations and that on or about July 3, 1928, the plaintiff recovered a judgment by the consideration of this court against another corporation, known as the Universal Coal Company, in the sum of $10,980., and that that judgment remained wholly unsatisfied. To charge the defendants with liability upon this judgment, the plaintiff alleged that said Universal Coal Company, against which the judgment was rendered, was at the time it became indebted to the plaintiff and at all times since then a mere corporate device, instrumentality and agency of the defendant, Price Hill Collieries Company, and was so organized and controlled that said defendant Price Hill Collieries Company was the real managing and controlling corporation; that Universal Coal Company was devised by the defendant Price Hill Collieries Company to enable the Price Hill Collieries Company to contract obligations and debts and secure assets, and escape the payment of any liabilities or debts arising from the contracts, actions and conduct of said Universal Coal Company, and that Price Hill Collieries Company was responsible and liable for the actions and contracts of said Universal Coal Company.

It was also alleged that the Universal Coal Company discontinued conducting any business in July, 1928, and that the defendants Price Hill Collieries Company and Universal Coal Sales Company, which had been organized by the defendant Price Hill Collieries Company, took

over all the assets of Universal Coal Company without paying anything therefor and without making any provision for the payment of the creditors of the Universal Coal Company, and said defendants having acquired all of the assets, were continuing to carry on the business of said Universal Coal Company under the corporate form and name of the defendants, and for that reason were liable to the creditors of said Universal Coal Company.

The defendants answered, admitting that plaintiff and defendants were corporations and that the plaintiff recovered a judgment against Universal Coal Company, as alleged in the petition; that neither of the defendants had paid anything upon the judgment, and denied the other allegations of the petition, and thereby put in issue their liability upon the judgment rendered against Universal Coal Company.

The evidence disclosed that the Price Hill Collieries Company owned or controlled some coal mines and that ostensibly the Universal Coal Company was a selling agency for its coal and was paid a commission of fifteen cents per ton upon coal sold. Universal Coal Company also bought some coal not produced by the Price Hill Collieries Company to fill orders of customers not desiring Price Hill Collieries Company coal, but approximately 90% of the coal sold by it was coal produced by Price Hill Collieries Company.

The evidence also showed that the stockholders of Universal Coal Company were S. Dixon, C. W. Dillon, M. E. French, S. A. Smiley and Price Hill Collieries Company, S. Dixon was president of Price Hill Collieries Company, M. E. French was his secretary, C. W. Dillon was attorney for Price Hill Collieries Company and S. A. Smiley, secretary and treasurer of that company. The evidence also showed that only twenty-five shares of the capital stock were issued, that Price Hill Collieries Company owned twenty of these shares in its own name and the other five shares stood in the names of the officers and employees aforesaid of Price Hill Collieries Company. Who the incorporators were, the evidence, perhaps, does not disclose distinctly. It does show that S. Dixon was

president and general manager and, at least, inferentially that he occupied these positions from the beginning of its corporate existence. It is a fair deduction from the evidence that Price Hill Collieries Co. caused the Universal Coal Company to be organized.

Price Hill Collieries Company paid $2,000 for its stock. The evidence left in doubt as to whether anything was paid for the additional five shares. With this capital Universal Coal Company apparently did a business requiring a capital turnover of somewhere between $75,000 and $100,000 annually. Its capital was manifestly inadequate even for a selling agency and, of course, furnished no basis for credit with which to purchase coal for re-sale in even the amount handled by it. It never paid any dividends to its stockholders, and on its books and the books of Price Hill Collieries Company became indebted to the latter company in excess of $8,000, which it owed for a period not definitely disclosed by the evidence. The only basis for this large credit was the relation existing between the two corporations.

When the judgment in favor of plaintiff against Universal Coal Company was rendered, Price Hill Collieries Company immediately took over all the assets of Universal Coal Company without let or hindrance by that company.

No corporate action authorizing the transfer was made, no agreement as to the terms of the transfer reached or attempted, no protest was voiced, and shortly thereafter Universal Coal Company was legally dissolved.

At the same time the Price Hill Collieries Company appropriated all the assets of Universal Coal Company, it was engaged in causing a new selling agency to be incorporated to carry on the same activities that had been conducted by Universal Coal Company theretofore, and this new agency was the defendant the Universal Coa Sales Company, having issued capital stock of twenty-five shares distributed equally among the officers and West Virginia attorneys of Price Hill Collieries Company. The evidence is not clear as to whether any capital at all was paid in. The aforesaid attorneys of the Price Hill Collieries Company subscribed for fifteen of the twenty-five

shares and the bookkeeper of all three of the corporations involved testified that his best recollection was that Price Hill Collieries Company paid for all stock that was in fact paid for.

A great mass of evidence was introduced to show the close affiliation of these three corporations. It is impossible to refer to it all in passing on this motion. They had the same officers, the same bookkeeper, all the books were kept in a building on the mining property of Price Hill Collieries Company, and letters were sent out to customers and prospective customers, in which it was stated that Universal Coal Company was wholly owned and controlled by Price Hill Collieries Company, and while some of these letters may not have had the actual sanction of the officers of Price Hill Collieries Company, others were sent out by the manager of the Universal Coal Company, to whom the inquirers had been referred for information, and in some instances copies of such letters were forwarded by him to Price Hill Collieries Company.

The evidence did not show the value of the assets that were appropriated by Price Hill Collieries Company, nor did it show the total indebtedness of Universal Coal Company at that time. The evidence did show that Universal Coal Company had been insolvent for a long period prior to that date and was insolvent at that time. The inference is fairly deducible that all of its assets would have been absorbed in court costs in a judicial liquidation.

No evidence was introduced that the plaintiff was deceived into believing that Price Hill Collieries Company was responsible for the obligations contracted by Universal Coal Company, or relied on the assets of Price Hill Collieries Company. It is fairly deducible from the evidence that the plaintiff at no time thought the Price Hill Collieries Company was liable to it until after it had secured its judgment against Universal Coal Company. It then levied upon the furniture in the office occupied by Universal Coal Company and in that way came into possession of its books and papers and discovered the evidence which it claims shows the liability of the Price Hill Collieries Company. There is no allegation

in the petition that the plaintiff did not know that Universal Coal Company was the agent of Price Hill Collieries Company at the time it obtained its judgment, but the evidence makes it fairly clear that it did not know.

Various persons attended the trial who held positions in all three of these corporations that are alleged to be identical, and W. H. W. Mason, one of those persons, was called to the witness stand by the plaintiff. He was assistant treasurer of Price Hill Collieries Company, acting treasurer of Universal Coal Company, and kept the books of all three corporations. Much of the evidence relating to stock ownership and dealings *inter sese* was given by him, although with manifest reluctance. The defendants had possession of the books of all three corporations, from which exact information could have been obtained as to what payments had been made for the stock, who had paid for it, and other details of the relations of the companies to one another, which, because of the absence of the books, is left to inference.

Mason was directed to bring the books, etc. and agreed to do so, and was given several days in which to bring them. He left the court room after having made that promise and never returned. No explanation of his failure to return was given.

The defendants had the power to produce the evidence and chose not to do so. That omission should be considered in weighing the evidence and drawing inferences therefrom.

There was evidence proving that the agents and attorneys of Price Hill Collieries Company defended the action against Universal Coal Company in which the judgment was rendered.

The first question presented on this motion for a new trial is whether this evidence and the permissible inferences therefrom show such a relation between Universal Coal Company and Price Hill Collieries Company as to make the latter company responsible upon the contract of the former, or, stated differently, makes the contract made in the name of the former the contract of the latter.

In the discussion of the law applicable to this case we do not stop to consider that class of cases in which one

corporation as the successor of another may become liable for the debts of the predecessar. Of that class is the case of *Ewing* v. *Composite Brake Shoe Co.,* 169 Mass., 72, relied on by defendant. It is the relation existing between two corporations at the time the obligation under consideration was incurred with which we are concerned here and not to a relation *ex post facto* of the transaction out of which the liability arose.

Corporations are creatures of the law. The law authorizes individuals to associate themselves together in a manner prescribed by law and thus bring into existence a corporation. The legislatures have considered it sound public policy to permit individuals to do this and in that way limit their liability in the transaction or business to be conducted by the corporation. Such a motive recognized and encouraged by the law cannot be characterized as dishonest or unworthy, even when the corporation is brought into existence by a single individual with that purpose in view. In substance that was all that was held in the case of *In Re Salomon,* decided by the *House of Lords,* and reported in *Appeal Cases of* 1897, *page* 22.

Quite a different question is presented when we come to consider the relation existing between two corporations. *There is no public policy enacted by any statute which authorizes one corporation to form or acquire another corporation for the purpose of limiting its liability.* While in many states, including Ohio, one corporation may own stock in another corporation, it is not contemplated that one corporation should organize or create another, and from the nature of the corporate entity—being purely artificial—there is an impossibility of one corporation either creating or participating in the management of another corporation. Natural persons can only do that. Section 8673-4, General Code of Ohio, in prescribing the method of creating a corporation expressly provides that:

"Any number of *natural* persons, not less than three, a majority of whom are citizens of the United States, may become a corporation."

Of course, in the nature of things, one corporation cannot be a director or officer of another corporation. While

it is impossible, as already stated, for one corporation to be a director or officer of another corporation, the natural persons organized as a corporation may attempt to do that for a corporation in their names, using the funds of one to finance the other, and it is pertinent to a decision of this motion to consider the legal obligations arising when two such corporations are thus brought into existence by the action of their officers and stockholders or after their creation are thus brought into such relation toward one another. In other words, it is the so-called relation of parent and subsidiary corporations with which we are concerned.

A very enlightening opinion on that subject by the Supreme Court of the United States was delivered in the case of *United States* v. *Reading Co. et al*, 253 U. S., 26. The essential fact in that case was that the officers of the Railroad Co. brought into existence a coal company through which it embarked upon the policy of attempting to control the anthracite tonnage in a certain district by acquiring extensive ownership of coal lands. The Railroad Company was the only stockholder in the Coal Company, and notwithstanding all the corporate forms were complied with in the creation of the corporation, and in the conduct of its business, the Supreme Court nevertheless held, as stated in the syllabus, that:

"While the ownership by a railroad company of shares of the capital stock of a mining company does not necessarily create an identity of corporate interest between the two such as to render it unlawful under the commodities clause for the railroad company to transport in interstate commerce the products of such mining company, yet where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require."

The facts in the case of *Van Driel* v. *Pennsylvania R. R. Co.*, 252 Fed., 35, were that the Railroad Company owned

all the stock of the Elevator Company, except a few shares necessary to qualify the officers, and the question was whether the Railroad Company was liable for the negligence of the Elevator Company in not having proper equipment, which resulted in a fire. The Court held, as stated in the syllabus, as follows:

"Where a railroad company owned all the stock of an elevator company, except a few shares necessary to qualify the latter's officers, and leased the elevator to another railroad company for 999 years, the latter assuming liability for damages, the lessee is liable for the loss to vessels by fire communicated on account of negligence in the operation of the elevator."

At page 39 the Court says:

"It would be impossible to imagine a relationship between corporations where the subsidiary corporation was more completely under the control of the dominant corporation. The elevators were constructed and operated merely as a facility to the business of the railroad company. Applying the language of Judge Wallace in *Lehigh Valley Railroad Co.* v. *DuPont,* 128 Fed., 840, 64 C. C. A., 478, the potential and ultimate control of all its property and business affairs of the elevator company was lodged in the railroad company, and this control was exercised as completely and directly as the machinery of corporate organisms would permit. Such complete dominance and control by the railroad company made the elevator company its mere puppet. *United States* v. *Del. Lack. & West. R. R.,* 238 U. S., 516, 35 Sup. Ct., 873, 59 L. Ed., 1438."

An instructive case on this subject is that of *Berkey* v. *Third Avenue Railway Co.,* 244 N. Y., 84. In that case three separate corporations having franchises to operate street railways over different routes, came under the domination of one of them, to-wit, Third Avenue Railway Company, which became the owner of substantially all of the stock of the others. The Third Avenue Railway Company apparently had nothing to do with bringing the other corporations into existence, and it was contrary to the law of New York for one street railway company to assign its franchise to another without the approval of the Railway Commission. An accident occurred upon the

route over which the subsidiary had the franchise and the action was brought to hold the parent corporation for the damage resulting from personal injury. We quote from pages 94 and 95 to indicate the reasoning of the Court on this subject:

"The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an 'alias' or a dummy. All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation. Dominion may be so complete, interference so obstructive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice (Ballantine, Parent & Subsidiary Corporations, 14 Calif. Law Review, 12, 18, 19, 20). The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law (*Chicago, etc. Ry. Co.* v. *Minn. Civic Assn.*, 247 U. S., 490; *United States* v. *Reading Co.*, 253 U. S., 26, 61, 63). At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form. We find in the case at hand neither agency on the one hand, nor on the other abuse to be corrected by the implication of a merger. On the contrary, merger might beget more abuses than if stifled. Statutes carefully framed for the protection, not merely of creditors, but of all who travel upon railroads, forbid the confusion of liabilities by extending operation over one route to operation over another. In such circumstances, we thwart the public policy of the state instead of defending or upholding it, when we ignore the separation between subsidiary and parent, and treat the two as one."

*Powell,* in his work on *Parent and Subsidiary Corporations,* has attempted to classify the cases holding the

parent corporation liable for the acts and contracts of the subsidiary and to state the different theories of liability. He presents the so-called "Instrumentality Rule," the "Identity Rule" and the "Agency Rule," without, however, attempting to reduce the first two to a formula. With reference to all these attempts at characterization and subdivision, *Ballantine* in an article reported in 14 Calif. Law Review, page 12, says at pages 20 and 21:

"The basic theory of corporation law is that a corporation exists as an entity entirely apart from its stockholders. There is in many cases much loose talk about 'ignoring the corporate fiction' and 'looking at the substance rather than the form.' But the corporate capacity is a legal fact, not a fiction. Problems of responsibility for fraud or for the acts of a corporation used as an agent are to be solved not by 'disregarding' the corporate personality, but by the application of the usual principles of liability for the acts of other persons or for collusion with them. Before the acts and obligations of a corporation can be legally recognized as those of particular individuals, and *vice versa,* it must appear that the circumstances are such that there is an agency of the one for the other or that the privilege is being abused so that an adherence to the distinction or separate capacity would sanction a fraud or promote injustice.

A subsidiary corporation is simply a species of one man corporation. But the concentration in the hands of one holder does not dissolve the corporation or put its entity into a state of suspense. There are a number of cases involving 'one man' corporations, where the court holds the sole stockholder liable for the acts of the corporation or holds the corporation bound by the act of the sole stockholder. The language of the opinion often places the decision on 'disregard of the corporate entity,' but most of them can be explained by a liberal application of ordinary agency rules, such as holding the corporation bound by the act of those in control, though without the usual formalities of a directors' meeting."

This State has long recognized that the fictitious person created by the law for certain purposes was to be disregarded when those purposes were fulfilled.

In the recent case of *Damascus Co.* v. *Union Trust Co.,* 119 O. S., 439, the Court at page 447 said:

"This Court has declared, in *State ex rel* v. *Standard Oil Co.,* 49 Ohio St., 137, 30 N. E., 279, 15 L. R. A., 145,

34 Am. St. Rep., 541: 'That a corporation is a legal entity, apart from the natural persons who compose it, is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it; but like every other fiction of the law, when urged to an intent and purpose not within its reason and policy, may be disregarded.'

The same principle is declared in Fletcher's Cyclopedia Corporations, Section 42:

'There is  *  *  *  substantial agreement that at certain times the fiction of corporate entity is inapplicable.  *  *  *  The doctrine of separate existence may be carried too far, and it is properly disregarded in case of fraud, circumvention of contract or statute, public wrong, monopoly, and like instances!'"

In the case of *Cemetery Association* v. *Traction Co.*, 93 O. S., 161, a corporation having the right of eminent domain sought to exercise that right, not for its own use, but for the use of another corporation. On page 174 the Court said:

"But it is a very different thing when one corporation causes a 'dummy' corporation to be organized, even if all the forms of the law should be fully complied with, if the latter has no real and *bona fide* purpose of its own, and no intention to attempt to actually carry out the object or its organization as set out in its articles of incorporation."

It would serve no purpose to consider further the authorities on this subject. The only conflict among them is as to whether the facts and circumstances appearing in the cases show such a relation between the two corporations as to make one responsible for the acts and contracts of the other.

In submitting this case to the jury, it was instructed that:

"Before the separate existence of these corporations can be disregarded, the greater weight of the evidence must show that Universal Coal Company was brought into existence by Price Hill Collieries Company; that it, Universal Coal Company, pursued no separate independent purpose with the object of making a profit for its own stockholders, that Price Hill Collieries Company, through the ownership of stock in Universal Coal Company, and

the furnishing of capital to it, had the power to completely control it and exercised that power so as to completely submerge its purpose in the purposes of Price Hill Collieries Company and the entire abandonment or surrender of any other purpose of Universal Coal Company."

In the opinion of the court, if the facts show a relation existing between these two corporations described in the above instructions, the Price Hill Collieries Company would be liable on a contract entered into in the name of Universal Coal Company, and in the opinion of the court, the reasonable inference to be drawn from the evidence justify the conclusion that that relation did exist. When that relation can be discovered in the circumstances, it matters not that writers have competed for a terse characterization and failed to produce a single expression or a definition that exactly defines the limits of liability. That difficulty is found in many branches of the law and in that quality that prevents an appearance of a static condition and gives to the law a progressive aspect resulting largely, if not entirely however, not from any change in the basic principle but rather to a restatement of an old rule to show its application to a new factual development. The fact remains in this case, that the circumstances show that two corporations are so merged or consolidated that they have no separate independent existence, interest or functions, and that being the actual condition presented, the fiction of separate corporate entities becomes immaterial. If they are separate, one acts through the other, or stated conversely, one acts for and on behalf of the other. If the fiction of separation is disregarded, then there is legally, as well as actually, but one actor. In either hypothesis the financially responsible corporation is charged with liability for the act.

The only other question remaining for consideration is whether or not the judgment rendered in the case against the Universal Coal Company, and upon which this action is predicated, was *res adjudicata* as to the Price Hill Collieries Company. The Court instructed the jury on that subject:

"In order for that judgment to be binding on Price Hill Collieries Company, it must appear by the greater

weight of the evidence that Universal Coal Company exercised no independent authority but was wholly and completely dominated and controlled by Price Hill Collieries Company, and further, that Price Hill Collieries Company assumed to and did, through its agents, officers and attorneys, defend that action against Universal Coal Company in which said judgment was rendered."

Counsel for the defendants cite the case of *Old Ben Coal Company* v. *Universal Coal Company*, 227 N. W., 794, decided by the Supreme Court of Michigan, as an authority against the liability of the defendants on this judgment. That was a case joining an action upon the original cause with an action upon this judgment, seeking to fasten a liability upon Price Hill Collieries Company. It came before the court on the sufficiency of the pleadings and the Court held that the pleadings stated a good cause of action against the Price Hill Collieries Company on the original obligation, but that the Price Hill Collieries Company was not liable on the judgment, the court saying at page 795:

"The theory of these counts, in so far as they are briefed by counsel, is that the Universal Coal Company, with whom plaintiff dealt, was, in legal effect, a mere agent, tool, or instrumentality of the undisclosed principal, the Price Hill Collieries Company, and that, as plaintiff had no knowledge of the undisclosed principal and the fact of the relation at the time it took judgment against the agent, it may still recover against the principal. The theory is good, but recovery against the principal must be on the original cause of action."

The question presented is whether or not that is the law of the state of Ohio. The case of *Boehmke* v. *Traction Company*, 88 O. S., 156, was one in which an action was filed against the Akron, Bedford & Cleveland Company for damages for personal injuries. Prior to the date the plaintiff received the injuries, the Akron, Bedford & Cleveland Company had been merged with another street railway company, and its line was actually being operated at the time by Northern Ohio Traction Company. Plaintiff and his attorneys, however, believed that Akron, Bedford & Cleveland Company still owned and operated

the railway. The action remained pending for several years—longer than the statutory period of limitation— then the plaintiff discovered that the Northern Ohio Traction Company was the owner and operator of the railway at the time he received his injuries, filed an amended petition, making it a party defendant, and a trial was had, resulting in a verdict and judgment for the plaintiff. Error was procesuted and one of the grounds was that the court erred in permitting the substitution of the Northern Ohio Traction Company for the Akron, Bedford & Cleveland Company. In deciding the case against the contention of the Northern Ohio Traction Company, the Court at page 163 said:

"Our statute of amendments is very liberal. In furtherance of justice the court may amend any pleading, process or proceeding by adding or striking out the name of any party, or by correcting a mistake in the name of a party or a mistake in any other respect. Section 11363, General Code.

The real party who did the wrong complained of was in court. It operated the railway on which it invited the plaintiff to become a passenger: under the name of A. B. C. published on the cars. The plaintiff naturally mistook the A. B. C. Company for the owner and operator of the railway, and sued it for his damage, instead of the N. O. T. Co., the real party responsible for his injury.

The court was right in amending the proceeding by substituting the name of the real defendant for whom its own attorneys appeared and made the defense for it in fact, though ostensibly for the company which was sued by mistake and whose legal personality, franchises, assets and obligations it had absorbed.

Having voluntarily come into court, though in the guise of The A. B. C. Co., and filed an answer in its own defense, though ostensibly for the nominal defendant sued by mistake, The N. O. T. Co. stopped the statute of limitations from running in its favor during the long period it graciously permitted the case to be continued in the false hope that the bar of the statute would ripen."

It seems to the court that that language is equally applicable to the case at bar. Had the plaintiff discovered the situation during the pendency of the original action, certainly under the authority of *Boehm* v. *Northern Ohio*

*Traction Co., supra.,* the Court would have been entirely within its rights in allowing an amendment substituting the Price Hill Collieries Company as defendant and rendering judgment against it, nor in the opinion of the court, can the plaintiff be said to have elected to pursue the Universal Coal Company alone. The rule is stated in 21 R. C. L. 894, as follows:

"The generally accepted rule seems to be that when the agency has been disclosed before suit is filed a judgment obtained therein against the agent, although unsatisfied, is a bar to an action against the principal. When, however, the fact *that an agency existed comes to the knowledge of the plaintiff only after he has obtained the judgment against the agent, if there has been no satisfaction therein, he may then proceed against the principal.*"

It is not expressly alleged in the petition that the plaintiff had no knowledge of the relation of Price Hill Collieries Company to the transaction at the time the judgment was taken; it is fairly deducible from the evidence, and is almost a conceded fact. The defense was a denial of any such relation.

That one standing in the relation of a principal will be bound by a judgment against his representative, when he was notified and actually participated in the defense, is a general rule. In *Freeman on Judgments,* (5th Ed.) Sec. 469, it is said:

"Consequently the principal or master is not bound by the judgment obtained in an action by or against the agent or servant and *vice versa,* unless he was a party or privy thereto by having authorized or actually and openly prosecuted or defended the action, or by having been notified and given an opportunity to defend under circumstances requiring him to do so."

Upon this subject see *Hart Steel Co.* v. *Railroad Supply Co.,* 244 U. S. 294, the second paragraph of the syllabus of which is as follows:

"The salaried manager of a corporation and the corporation itself, the capital stock of which is all owned by another corporation for which it is a mere sales agent, are so obviously in privity with the holding corporation

that a final decree of a Federal circuit court of appeals in favor of that corporation in a suit brought against it for the infringement of certain patents which the court finds to be void for want of invention must be treated as *res judicata* in a suit brought in another circuit by the same complainant, against the former corporation and its manager, involving the same subject-matter and issues."

At pages 298 and 299 the court says:

"Identity of interest could not be clearer or closer than it was between the defendants in the two cases,—they represented precisely the same, single interest, and the Hart Company and Wood, as agents of the Elyria Company were obviously and necessarily privies to the judgment rendered in its favor in the circuit court of appeals for the sixth circuit. *Bank of Kentucky* v. *Stone,* 88 Fed. 393, affirmed in Kentucky Bank Tax Cases, 174 U. S., 408, (43 L.ed. 1187, 19 Sup. Ct. Rep. 881) ; *Emery* v. *Fowler,* 39 Me. 329, 63 Am. Dec. 627; *Castle* v. *Noyes,* 14 N. Y., 326; *Emma Silver Min. Co.* v. *Emma Silver Min. Co. of New York,* 7 Fed. 401.

With the identity of the subject-matter and issues of the two cases admitted; the privity of parties to them clear, and the question of the ruling effect of the decree of the circuit court of appeals for the sixth circuit presented in an appropriate manner to the cicuit court of appeals for the seventh circuit, a court of co-ordinate jurisdiction, we cannot doubt that the latter court fell into error in not sustaining the motion of the petitioners to affirm the decision of the circuit court. The defendants should not have been put to further expense, delay and trouble after the motion was presented."

The representation of Price Hill Collieries Company by Universal Coal Company was so complete as to make Price Hill Collieries Company, other than in name, virtually a party to that action.

The conclusion is that the plaintiff is entitled to avail itself of the judgment against Universal Coal Company as *res judicata* against Price Hill Collieries Company.

The reasoning that holds Price Hill Collieries Company liable also makes the Universal Coal Sales Company liable.

The motion for a new trial is overruled.